**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BRUNSWICK CORPORATION AND** | ) | |
| **SUBSIDIARIES,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **07 C 3792** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This tax case centers on the ability of plaintiff Brunswick Corporation and its subsidiaries

to obtain a refund of Federal income taxes paid for the taxable year ending on December 31,

1986.[1]  The parties' cross-motions for summary judgment are before the court.  For the following

reasons, the government's motion for summary judgment is granted, and Brunswick's motion for

summary judgment is denied.

**I.    Background**

The court adopts the parties' stipulated facts, and notes that while all of the facts are

agreed, the parties dispute the relevance of certain facts as discussed more fully below.

---

[1]  Brunswick's present efforts to seek a refund for taxes from twenty-two years ago are timely because it entered into an agreement with the government to extend the statute of limitations to June 30, 1994.  In 1994, Brunswick duly filed an amended Federal tax return for the 1986 taxable year.  Finally, in October of 2005, Brunswick received a notice of disallowance of its claim for refund.  Complaint at ¶¶ 47-50; Complaint Ex. A (Form 872 Consent to Extend the Time to Assess Tax).  It then filed its complaint for a Federal income tax refund within two years of the date of the notice of disallowance.  *See* Internal Revenue Code ("IRC") § 6532(a).

With respect to the IRC, unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended, that was in effect during the 1986 taxable year.  References to the regulations are to those provisions in effect at that time.  The court thanks counsel for providing copies of the relevant IRC provisions and accompanying regulations that are not currently in effect, as well as the legislative history and other background materials cited in the parties' memoranda.

### A. The Parties

Plaintiff Brunswick Corporation has its principal place of business in Lake Forest, Illinois. Defendant is the United States of America.

### B. The Brunswick Consolidated Group

Brunswick is, and during the taxable year ending December 31, 1986 (the "1986 Tax Year") was, a consolidated group of corporations, which included Brunswick Corporation as the parent and its domestic subsidiaries as members. From 1960 to the present, Brunswick, itself and through its subsidiaries, has continuously participated in the marine business, including at various times, the manufacture and sale of pleasure boats, marine engines and marine anchors.

Brunswick is, and during the 1986 Tax Year was, a calendar-year taxpayer and files its Federal income tax returns accordingly. Brunswick filed a consolidated Federal income tax return for the 1986 Tax Year, which included the income and deductions of it and its domestic subsidiaries for the period January 1, 1986 through December 31, 1986.

### C. Brunswick's Acquisition of Bayliner

On December 8, 1986, Brunswick acquired all of the outstanding stock of Bayliner Marine Corporation ("Bayliner Marine"), a subchapter S corporation, and its affiliates, U.S. Marine Corporation ("U.S. Marine") and Blue Fin Industries, Inc., both subchapter C corporations. This transaction is hereinafter referred to as the "Bayliner Acquisition." Only depreciation deductions attributable to Bayliner Marine and U.S. Marine (collectively, "Bayliner") assets, and not Blue Fin Industries, Inc. assets, are at issue with respect to the Bayliner Acquisition.

Prior to and at the time of the Bayliner Acquisition, Bayliner was in the business of manufacturing pleasure boats and marine engines. As of the acquisition date, Bayliner was not part of a consolidated group nor was it related to Brunswick. Bayliner Marine and its affiliate U.S. Marine were members of the Brunswick consolidated group for the portion of the 1986 Tax Year following the Bayliner Acquisition. The Bayliner Acquisition was a qualified stock purchase within the meaning of IRC §§ 338(a) and 338(d)(3).

Pursuant to IRC § 338(g), Brunswick timely filed Forms 8023, Corporate Qualified Stock Purchase Elections with respect to its stock purchases of Bayliner Marine and U.S. Marine. As a result of Brunswick's IRC § 338(g) elections, for Federal income tax purposes, Bayliner Marine and U.S. Marine were treated as having sold all of their assets as of the acquisition date, December 8, 1986 ("Old Bayliner"). Bayliner Marine and U.S. Marine were then treated as new corporations which purchased all of the assets of Old Bayliner and placed such assets into service as of the day after the acquisition date, December 9, 1986 ("New Bayliner").

The following diagram, from a treatise excerpt provided by Brunswick (see Brunswick's response at Ex. C), helpfully illustrates this chain of events.

T = target (here, Bayliner Marine and U.S. Marine)
Old T = target prior to acquisition
New T = target after acquisition
P = parent
shs = shareholders
QSP = qualified stock purchase



C.D. BLOCK, CORPORATE TAXATION: EXAMPLES AND EXPLANATIONS, 309 (3d ed. 2004).

The assets acquired by the new corporations included tangible personal property such as equipment, vehicles and molds and tooling, which qualified as recovery property under § 168(c)(1) (the "Bayliner Property"). The parties agree that the Bayliner Property is depreciable under the Accelerated Cost Recovery System ("ACRS") using the half-year convention.[2] This stipulation is, at first glance, surprising since the issue in this case is whether the half-year convention (Brunswick) or the short taxable year (the government) applies when calculating the depreciation for the property purchased by Brunswick. *See* IRC § 168(f)(5) (contains provisions regarding short taxable years – *i.e.*, taxable years of less than 12 months).[3]

---

[2] In 1986, IRC § 168(b)(1) required taxpayers to depreciate all tangible personal property placed in service at any point during the taxable year, as if such property were placed in service at the mid-point of such year. This is known as the "half-year convention." As Brunswick notes, if the half-year convention is applicable, it can benefit taxpayers (in the case of property acquired in later months of the tax year) or function to taxpayers' disadvantage (in the case of property acquired in the early months of the tax year). Here, with respect to property acquired in December of 1986, use of the half-year convention would benefit Brunswick.

[3] The short taxable year rules require that where the taxable year of a corporation is less than twelve months, the annual depreciation deduction otherwise allowable is limited to a pro rata portion of that annual depreciation deduction based on the number of months out of twelve

The answer to this seeming condundrum is that the short taxable year acts as an overlay on top of the half-year convention. Brunswick contends that the half-year convention applies across the board and that the taxable year at issue is its taxable year. On the other hand, the government asserts that New Bayliner's tax year is the relevant tax year, that New Bayliner had a short taxable year (since it came into existence in December of 1986), and that Brunswick is, therefore, entitled to 1/12 of the annual depreciation deduction for New Bayliner otherwise allowable under the half-year convention. The half-year convention thus always applies, but the applicability of the short taxable year is disputed and controls whether Brunswick is entitled to a refund or not.

### D.     Brunswick's Acquisition of Sea Ray

On December 30, 1986, Brunswick acquired all of the outstanding stock of Ray Industries, Inc., a subchapter C Corporation, and its subsidiaries, all subchapter C corporations (collectively, "Sea Ray"). This transaction is hereinafter referred to as the "Sea Ray Acquisition." Prior to and at the time of the Sea Ray Acquisition, Sea Ray was in the business of manufacturing pleasure boats. Sea Ray was not related to Brunswick on the acquisition date. Sea Ray Industries, Inc. and its domestic subsidiaries (collectively, "Sea Ray") were members of the Brunswick consolidated group for the portion of the 1986 Tax Year following the Sea Ray Acquisition. The Sea Ray Acquisition was a qualified stock purchase within the meaning of IRC §§ 338(a) and 338(d)(3).

---

that are in the taxpayer's taxable year. Where a corporation has a short taxable year for its first taxable period as a member of a consolidated group and places its acquired assets in service during that short taxable year, the depreciation deduction for that corporation's assets is limited by the rules of IRC § 168(f)(5).

Pursuant to IRC § 338(g), Brunswick timely filed Form 8023, Corporate Qualified Stock Purchase Elections with respect to its stock purchase of Sea Ray.  As a result of Brunswick's IRC § 338(g) election, for Federal income tax purposes, Sea Ray was treated as having sold all of its assets as of the acquisition date, December 30, 1986 ("Old Sea Ray").  Sea Ray was then treated as a new corporation which purchased all of the assets of Old Sea Ray and placed such assets into service as of the day after the acquisition date, December 31, 1986 ("New Sea Ray").

The assets acquired by the new corporation included tangible personal property such as equipment, vehicles and molds and tooling, which qualified as recovery property under § 168(c)(1) (the "Sea Ray Property").  As with New Bayliner, the parties agree that the Sea Ray Property is depreciable under the ACRS using the half-year convention.

### E.     Brunswick's Claim for Refund for the 1986 Tax Year

For the 1986 Tax Year, Brunswick filed a consolidated Federal income tax return that included Bayliner Marine, U.S. Marine, and Sea Ray as members for the portions of the 1986 Tax Year beginning after the Bayliner Acquisition and the Sea Ray Acquisition, respectively. Brunswick included income and deductions of Bayliner Marine, U.S. Marine, and Sea Ray on its consolidated Federal income tax return for the 1986 Tax Year.  During the Internal Revenue Service audit for the 1986 Tax Year, Brunswick and the Internal Revenue Service agreed on the proper amounts of income and deductions attributable to Bayliner Marine, U.S. Marine, and Sea Ray to be reported on Brunswick's consolidated Federal income tax return for the 1986 Tax Year, with the exception of the amount of the depreciation deductions at issue in this proceeding.

After agreeing to extend the statute of limitations on assessment for the 1986 Tax Year, Brunswick filed a claim for refund, in the form of an amended Federal income tax return, for the

1986 Tax Year, dated November 29, 1994, in which it claimed additional depreciation

deductions – in the aggregate amount of $6,059,132 – for the Bayliner Property and the Sea Ray

Property. Brunswick's claim for refund was signed on November 29, 1994, and received by the

Internal Revenue Service on December 2, 1994. Brunswick received a Notice of Disallowance

of its Claim for Refund dated October 4, 2005 and filed a timely Federal action challenging this

decision. The parties' cross-motions for summary judgment are before the court.

## II.     Discussion

### A.     Standard for a Motion for Summary Judgment

Summary judgment is proper when the "pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue of any material fact" and a moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B.     The Parties' Positions

The applicable version of IRC § 338(g) allows a purchasing corporation to elect to have

certain stock purchases treated as asset acquisitions.[4] Section 338(a) contains provisions

---

[4] Section 338 was enacted as part of the Tax Equity and Fiscal Responsibility Act
("TEFRA") of 1982. In enacting § 338, Congress attempted to simplify a complex area of the
tax laws. The court will not attempt to restate the government's succinct summary of the
rationale underlying this section. As noted by the government, § 338 was meant "to prohibit a
purchasing consolidated group from obtaining the tax benefits of the old target corporation
during the period between acquisition and liquidation and to eliminate selectivity, that is, to
prevent the purchasing corporation from obtaining the best of both tax worlds by purchasing
those assets of the target for cash that provided it and the target with the most favorable tax
treatment and purchasing the remaining assets through a stock purchase followed by a tax-free
liquidation that would give the purchasing corporation a stepped-up basis with no tax cost to it.
To prevent this selectivity that was possible by inconsistently treating some purchases as asset
purchases and others as stock purchases under the prior law, Congress enacted the consistency
provisions found in IRC § 338(e) and (f). Congress also authorized the Secretary of the

governing corporations which made a § 338(g) election and provides that:

> For purposes of this title, if a purchasing corporation makes an election under this section . . . then, in the case if any qualified stock purchase, the target corporation–
>
> (a)(1) shall be treated as having sold all of its assets at the close of the acquisition date at fair market value in a single transaction to which section 337 applies,[5] and
>
> (a)(2) shall be treated as a new corporation which purchased all of the assets referred to in paragraph (1) as of the beginning of the day after the acquisition date.[6]

As noted above, in December of 1986, Brusnwick purchased all of the stock in two

separate corporate groups, Bayliner and Sea Ray.  When filing its 1986 income tax return,

Bruswick made an election under IRC § 338(g).  This case turns on certain tax consequences of

this purchase.

---

Treasury, in IRC § 338(i)(1), to prescribe regulations to carry out the purposes of IRC § 338, including regulations to ensure the consistency of treatment of asset and stock sales and purchases so that such transactions may not circumvent any provision of law or regulations." Government's Motion at 7, n.8; *see also* C.D. BLOCK, CORPORATE TAXATION: EXAMPLES AND EXPLANATIONS, at 309-12.

[5] Section 337 deals with gain or loss on sales or exchanges in connection with certain liquidations.

[6] "The term 'purchasing corporation' means any corporation which makes a qualified stock purchase of stock of another corporation."  IRC § 338(d)(1).  "The term 'target corporation' means any corporation the stock of which is acquired by another corporation in a qualified stock purchase.  IRC § 338(d)(2).  ""The term 'qualified stock purchase' means any transaction or series of transactions in which stock of 1 corporation possessing 338(d)(3)(A) at least 80 percent of total combined voting power of all classes of stock entitled to vote, and 338(d)(3)(B) at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), is acquired by another corporation by purchase during the 12-month acquisition period.   IRC § 338(d)(3).

Brunswick contends that it is entitled to calculate depreciation relating to the Bayliner and Sea Ray stock purchase by applying the half-year convention method to the full tax year. This argument is based on Brunswick's use of its taxable year, rather the length of the tax year for each acquired subsidiary while in Brunswick's consolidated group, to control the amount of depreciation deductions allowed for the tangible property owned by the two subsidiaries. In support, Brunswick stresses that the IRC has used different methods to calculate depreciation over the years, but the half-year convention has been a consistent element of those various methods and continues to be applied to calculate depreciation deductions today. It then concludes that under § 168(b)(1) and administrative guidance, the half-year convention applies and allows it to claim six months of depreciation deductions (*i.e.*, from July 1 through December 31, 1986) for the Bayliner and Sea Ray property.

Brunswick also argues that its § 338 election entitled it to treat the Bayliner and Sea Ray stock purchases like deemed asset purchases for Federal income tax purposes (in other words, Brunswick contends that the transaction at issue should be treated as an asset purchase, as opposed to a stock purchase). It thus asserts that it would be inequitable to allow it only one month of depreciation deductions with respect to the property in issue because if it had acquired the assets outright it would have been entitled to depreciation based upon a full year of depreciation. The government, on the other hand, contends that Brunswick's § 338 election with respect to the purchase of Bayliner and Sea Ray stock means that Bayliner and Sea Ray were treated, for tax purposes, as having sold all of their assets to a new taxable entity on the date of acquisition. In their capacities as new taxable entities, New Bayliner and New Sea Ray were then treated as having reacquired all of the sold assets and having placed those reacquired assets

in service on the day after the stock acquisition. As a result of Brunswick's stock acquisitions and elections under IRC § 338, and the consolidated return regulations, each acquired subsidiary then became a member of Brunswick's consolidated group.

According to the government, under the consolidated return regulations, the taxable income of a consolidated group is computed as if each member of the group were a separate corporation. This means that depreciation deductions are determined for the consolidated group at the subsidiary level when filing a consolidated return (*i.e.*, the consolidated group's taxable income is assessed using depreciation deductions calculated separately for each member of the group). Focusing on Bayliner and Sea Ray, not Brunswick, the government reasons that the short taxable year provisions apply because after the acquisitions, these entities became New Bayliner and New Sea Ray, which were new taxable entities.

As such, they (not Brunswick) placed in service the assets they were treated as having purchased. Thus, the government concludes that the depreciation deduction with respect to those assets depends upon their short taxable years, not on the length of Brunswick's taxable year. This means that with respect to the tangible property of New Bayliner and New Sea Ray, Brunswick was entitled to deduct 1/12 of the annual depreciation deduction otherwise allowable under the half-year convention.

Thus, in a nutshell, Brunswick prevails if it is entitled to claim six months of depreciation deductions for the depreciable assets of New Bayliner and New Sea Ray. On the other hand, the government prevails if depreciation is calculated using a short taxable year for New Bayliner and New Sea Ray. For the following reasons, the court finds that the government's method of assessing depreciation is correct.

## C.    Calculation of Depreciation

The court will begin with the government's arguments about the applicability of the short taxable year provisions and will address: (1) the applicable statutes and regulations; (2) the tax implications of the fact that New Bayliner and New Sea Ray placed the property that is sought to be depreciated into service; (3) the consolidated return regulations and how they affect calculation of the depreciation deduction; and (4) the consequences of New Bayliner and New Sea Ray's adoption of Brunswick's taxable year.

The court will then consider: (1) Brunswick's argument that it should be entitled to treat its purchase of Old Bayliner and Old Sea Ray's stock like an asset purchase because the IRS treated the targets as if they were selling assets; (2) the impact of versions of § 338 pre- and post-dating the version in effect at the relevant time; and (3) the persuasive value of certain informal IRS documents.

### 1.    Short Taxable Year

In 1986, IRC §§ 167 and 168 and the corresponding regulations governed depreciation deductions.  IRC § 167(a) allowed a depreciation deduction for the "use" of property by authorizing a deduction consisting of a reasonable allowance for the depreciation of property used in a trade or business or held for the production of income.   The deduction described in IRC § 168 constitutes the reasonable allowance described in IRC § 167 for recovery property.  IRC § 168(a), the ACRS provision, allows a depreciation deduction for any taxable year with respect to recovery property.[7]   In turn, § 168(b) provides that the amount of the deduction

_____

[7]   Recovery property is tangible property that is either used in a trade or business or held for the production of income, and is subject to the allowance for depreciation.  IRC § 168(c).  The term generally refers to tangible, depreciable business property placed in service after 1980

described in § 168(a) is the applicable percentage of the unadjusted basis of the recovery property after the basis of the property is first adjusted under § 168(d)(1)(A).

IRC § 168(d)(1)(B)(i) provides that the unadjusted basis of the recovery property shall first be taken into account in the taxable year in which the property is placed in service. *See also* Treas. Reg. § 1.167(a)-10(b) (depreciation of an asset begins when the asset is placed in service). "Property is first placed in service when first placed in a condition or state of readiness and availability for a specifically assigned function . . . ." Treas. Reg. § 1.167(a)-11(e). Determining when property is placed into service depends on *who* placed it in service, as "the term 'first placed in service' refers to the time the property is first placed in service by the taxpayer, not to the first time the property is placed in service." Treas. Reg. § 1.167(a)-11(e)(1).

The parties agree here that the property in issue was placed in service by New Bayliner and New Sea Ray on the day after Brunswick acquired Old Bayliner and Old Sea Ray. *See* SAF ¶¶ 13, 22. Thus, the taxpayers who placed the property in service (here, New Bayliner and New Sea Ray) are the taxpayers who may claim a depreciation deduction because a taxable entity that places property into service is the only entity who may claim depreciation deduction. *See* Treas. Reg. §§ 1.167(a)-10(b) and 11(e)(1); *see also* IRC § 338(a)(2) (the new target, not the parent, acquires the assets).

Matters are not that simple, however, as after the acquisition, New Bayliner and New Sea Ray were part of a consolidated group and did not file their own returns. Brunswick thus asserts that it – not New Bayliner and New Sea Ray – acquired the assets of Old Bayliner and Old Sea Ray and thus is entitled to claim depreciation deductions for New Bayliner and New Sea Ray.

and before 1987.

This is correct only insofar as Brunswick may claim the depreciation deductions on behalf of its subsidiaries because it is the parent of a consolidated group.

However, with respect to what those deductions are, where a purchasing corporation is the parent of a consolidated group, IRC §§ 338(a) and (g) and certain consolidated return regulations control how the depreciation deduction is calculated. As noted above, § 338(a) allows a purchasing corporation to make an election with respect to a qualified stock purchase of a target corporation. If such an election is made, two events are treated as having occurred, both of which are depicted in the illustration at § I(C), *supra*.

First, the target corporation is treated as having sold all of its assets as of the close of the date of acquisition. *See* IRC § 338(a)(1). Thus, the target's tax year ends on that date. *See* Treas. Reg. §1.338-1T(b)(8). Second, a new taxable entity (here, New Bayliner and New Sea Ray) – *not* the purchasing corporation (here, Brunswick) – is treated as having purchased all of the assets of the former target (here, Old Bayliner and Old Sea Ray) as of the beginning of the day after the acquisition date for the amount paid for the stock plus any assumed liabilities. *See* IRC § 338(a)(2).

In other words, in practical effect, if a purchasing corporation makes a § 338 election, the old target disappears and a new taxable entity comes into existence the following day that is unrelated to the old target corporation and has all new tax attributes, including a new tax year and a new tax basis for its assets. This is why many of Brunswick's arguments are unconvincing. As noted above, Brunswick repeatedly asserts that *it* acquired the assets of Old Bayliner and Old Sea

Ray.[8]  This may be true in the colloquial sense because Brunswick is the parent and New

Bayliner and New Sea Ray are subsidiaries.  However, under the relevant IRC provisions,

subsidiaries New Bayliner and New Sea Ray – not Brunswick – directly acquired the assets of

Old Bayliner and Old Sea Ray.  The only property acquired by Brunswick was the stock in the

two target corporations, Old Bayliner and Old Sea Ray.

The treasury regulations provide that "the consolidated return of a group must be filed on

the basis of the common parent's taxable year, and each subsidiary must adopt the common

parent's annual accounting period for the first consolidated return year for which the subsidiary's

income may be included in the consolidated return."  Treas. Reg. § 1.1502-76(a)(1).  At first

glance, the fact that New Bayliner and New Sea Ray must adopt Brunswick's taxable year

appears to mean that Brunswick's taxable year controls, so Brunswick is entitled to a refund.[9]

_____

[8]  *See, e.g.*, Brunswick's memorandum at 1 (Brunswick seeks a depreciation deduction for "tangible personal property it acquired" from Bayliner and Sea Ray); 4 ("the assets Brunswick acquired from Bayliner and Sea Ray"); *id.* at n.8 (" Brunswick, through New Bayliner, acquired additional tangible personal property"); 6 at n.11 (citing to part I of Brunswick's amended Federal income tax return for the 1986 tax year, which alleges that the property in issue was "acquired from Bayliner and Sea Ray"); 9 ("had Brunswick acquired the Bayliner and Sea Ray Property in direct asset purchases (rather than deemed asset purchases under § 338 . . ."); 23 ("Section 338 mandates that, for Federal income tax purposes, Brunswick's deemed asset purchases under §338(g) receive the same treatment as direct asset purchases").

[9]  This is consistent with Brunswick's argument that the short taxable year provision, IRC § 168(f)(5), only applies if the *consolidated group* (as opposed to one or more of its subsidiaries) had a short taxable year.  According to Brunswick, § 168(f)(5) is inapplicable because it did not have a short taxable year.  The problem with this argument is that New Bayliner and New Sea Ray did not file their own separate returns after the acquisition.  Instead, as part of a consolidated group, Brunswick filed on their behalf.  The fact that these entities did not file a return, however, does not mean that they did not have a separate short taxable year following the acquisition, as the government thus correctly points out that where a subsidiary joins a consolidated group in the middle of the parent's taxable year, it has a short taxable year beginning on the date its income is included in the consolidated return and ending on the last day of the parent's taxable year.  *See* IRC §338(a)(2); Treas. Reg. §§ 1.1502-76(b)(1) & (2) and 1.1502-76(b)(3), example 1; Treas.

*See* Brunswick's Response at 3 ("as members of the Brunswick consolidated group, they [New Bayliner and New Sea Ray] adopt Brunswick's consolidated taxable year. Without separate taxable years, New Bayliner and New Sea Ray cannot possibly have short taxable years. Thus, Brunswick's consolidated taxable year is the only relevant year for purposes of § 168(f)(5)").

However, there are (unsurprisingly) additional levels of applicable provisions. Where a corporation becomes a member of a consolidated group during the parent's taxable year, that new member's income is includible in the consolidated return for that year from the date it first became a member of the consolidated group and, as noted above, the new member must adopt the annual accounting period of its parent. Accordingly, the new member's income is includible from the date during the parent's annual accounting period that the new member became a member (*i.e.*, the date of the acquisition) to the end of the parent's annual accounting period.

"[T]he consolidated taxable income for a consolidated return year shall be determined by taking into account the separate taxable income of each member of the group." Treas. Reg. § 1.1502-11(a)(1). Treas. Reg. § 1.1502-12 addresses the computation of separate taxable income and provides that, with certain exceptions not relevant to this case, the separate taxable income of each member of a consolidated group (including depreciations) shall be computed in accordance with the provisions of the IRC covering the determination of taxable income of separate corporations, including IRC §168(f)(5). Thus, certain items affecting the consolidated group's taxable are computed at the group level, but depreciation deductions are

---

Reg. §§ 1.168-2(f)(4) and 1.338-1T(f)(7) (entitled "New Target's Taxable Year . . . "); Treas. Reg. §1.338-1T(h)(2)(ii) (referring to the new target's first taxable year after an IRC § 338 election is made). The fact that Brunswick did not personally have a short taxable year is, therefore, irrelevant.

not.  *See Jack Kent Cooke, Inc. v. United States*, No. A. 95-1747-A, 1996 WL 628314, at \*2

(E.D. Va. Aug. 27, 1996) ("Individual corporations in a consolidated group do not have uniform

tax attributes.  Depreciation deductions are figured at the individual rather than at the group

level"), *aff'd by* 116 F.3d 1473 (4th Cir. 1997) (unpublished order).

This is true despite Brunswick's citation to *United Dominion Industries, Inc. v. United*

*States*, 532 U.S. 822 (2001).  Brunswick asserts that in *United Dominion*, the Supreme Court

authorized the use of tax treatment that provides "comparable treatment" between "the usual

corporate taxpayer and [a] group filing a consolidated return" and then found that in calculating

product liability losses, such comparability could be achieved only by applying a consolidated

approach and treating the group's tax liability as if were a single enterprise.  *Id*. at 831-33.

The court disagrees with the suggestion that this holding means that the policies

underlying the consolidated return system requires that all tax items be considered at the

consolidated group level, not the subsidiary level.  First, such a reading is at odds with the IRC

provisions and corresponding regulations discussed above.  Second, the issue before the *United*

*Dominion* court was whether net operating losses associated with product liability loss had to be

accounted for at the consolidated return level or the subsidiary level.  *Id*. at 824.

In resolving this issue, the Supreme Court looked to the definition of consolidated net

operating loss in the IRC and regulations, explaining that:

> Under Treas. Regs. §§ 1.1502-11(a) and 1.1502-21(f), an affiliated group's
> "consolidated taxable income" (CTI), or, alternatively, its "consolidated net
> operating loss" (CNOL), is determined by "taking into account" several items.
> The first is the "separate taxable income" (STI) of each group member.  A
> member's STI (whether positive or negative) is computed as though the member
> were a separate corporation (*i.e.*, by netting income and expenses), but subject to
> several important "modifications."  Treas. Reg. § 1.1502-12.  These modifications

require a group member calculating its STI to disregard, among other items, its capital gains and losses, charitable-contribution deductions, and dividends-received deductions. *Ibid.* These excluded items are accounted for on a consolidated basis, that is, they are combined at the level of the group filing the single return, where deductions otherwise attributable to one member (say, for a charitable contribution) can offset income received by another (from a capital gain, for example). Treas. Regs. §§ 1.1502-11(a)(3) to (8); 1.1502-21(f)(2) to (6). A consolidated group's CTI or CNOL, therefore, is the sum of each member's STI, plus or minus a handful of items considered on a consolidated basis.

*Id.* at 826.

In other words, in *United Dominion*, the Supreme Court looked to the IRC and regulations and found that the taxable income of a consolidated group, with certain exceptions not relevant here, was comprised of all of the taxable incomes of the group members pursuant to Treas. Reg. §§1.1502-11(a)(1) and 1.1502-12. The Supreme Court also held that net operating losses had to be accounted for at the consolidated return level, as opposed to the subsidiary level, because the only definition of net operating loss in the code and regulations was for a consolidated net operating loss. *Id.*

*United Dominion* thus does not stand for the blanket proposition that depreciation is determined at the consolidated return level. Instead, it teaches that courts considering whether to look at the consolidated return level or the subsidiary level should look to the applicable IRC provisions and regulations. *See id.*; *see also Intermet Corp. & Subsidiaries v. C.I.R.*, 209 F.3d 901, 908 (6th Cir. 2000) (noting that where "[e]xplicit statutory or regulatory provisions supported the separate member approach," the "default rule" underlying the court's finding that a taxpayer filing a consolidated Federal income tax return was entitled to a 10-year carryback for certain expenses incurred by a member corporation was inapplicable). This court thus must consider the applicable IRC provisions and the accompanying regulations.

Both the IRC and the regulations contain direct guidance as to how to calculate depreciation deductions for property owned and placed in service by subsidiaries who are members of a consolidated group. Specifically, Treas. Reg. §§ 1.1502-11(a)(1) and 1.1502-12 provide that the separate taxable income of each member of the consolidated group, which includes depreciation deductions, must be computed, with certain exceptions not relevant here, on the subsidiary level. *See United Dominion Industries, Inc. v. United States*, 532 U.S. at 826 (an affiliated group's consolidated taxable income is based on, among other things, each group member's separate taxable income). Looking at the subsidiary level, New Bayliner and New Sea Ray had short taxable years. This means that under IRC § 168(f)(5), they must prorate their depreciation deductions in computing their separate taxable incomes that are included on Brunswick's consolidated return.

To sum up, the depreciation rules applicable to each member, rather than the rules applicable to the parent, control the amount of the depreciation deduction the parent may take. Moreover, for a consolidated group, the parent's taxable year does not control the depreciation deductions it is entitled to for property owned and placed in service by its subsidiaries. Accordingly, when New Bayliner and New Sea Ray are viewed at the subsidiary level as opposed to the parent's level, their short taxable years are the relevant tax years, not Brunswick's taxable year (using the half-year convention). This reading of the IRC and relevant regulations dooms Brunswick's contention that the court should use the half-year convention and Brunswick's taxable year in assessing depreciation for New Bayliner and New Sea Ray.

2.    **Should Brunswick Be Entitled to Treat its Stock Purchase like an Asset Purchase Because the IRS Treated the Targets as If They Were Selling Assets?**

This conclusion is not affected by Brunswick's emphasis on the fact that the IRS did not allow the two target corporations to deduct any depreciation on their last tax return with respect to the assets in issue and, instead, treated the targets as if they had engaged in asset sales rather than stock sales.   According to Brunswick, because the target corporations were treated as selling assets, its purchase of their stock should be treated as an asset purchase.

First, the Supreme Court has rejected this line of reasoning, holding that:

> The propriety of a deduction does not turn upon general equitable considerations, such as a demonstration of effective economic and practical equivalence. Rather, it depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed . . . . This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen to follow but did not.

*Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 148-49 (1974) (internal citations and quotations omitted).

Second, Brunswick's argument is inconsistent with the statutory scheme.  As shown in the diagram in § I(C), *supra*, three transactions occur when a parent purchases a target's stock and then makes an election under IRC § 338 election:  the target's stock is sold, the target's shareholders (but not the target corporation) have a capital gain or loss, and the acquiring corporation eventually owns the stock of a new version of the acquired target.  Thus, Brunswick acquires stock, not assets.  If it had wanted to acquire the Old Bayliner and Old Sea Ray assets

-19-

directly and get the additional depreciation deduction it now seeks, it could have purchased them instead of acquiring stock.

The government speculates as to why Brunswick did not do so, theorizing that selling the stock instead of selling assets avoids a two-level capital gains tax, and Brunswick was able to purchase the stock for less than the assets would have cost. *See generally* C.D. BLOCK, CORPORATE TAXATION: EXAMPLES AND EXPLANATIONS, at 291-339 (discussing taxable mergers and acquisitions). Regardless of Brunswick's reasons, however, it cannot rewrite history 22 years after the fact. Despite the fact that the IRS treated Old Bayliner and Old Sea Ray as if they had engaged in asset sales rather than stock sales, Brunswick purchased Old Bayliner and Old Sea Ray's stock, not their assets. The stock acquisition rules – not the asset rules – thus apply to Brunswick.

### 3.      The Law Before and After the Enactment of § 338

Brunswick also argues at length that the law applicable prior to 1982 and after 1986 entitles it to receive the full deduction, as opposed to a prorated one using New Bayliner and New Sea Ray's short taxable year. This court, however, is charged with interpreting and applying the law in effect at the time of the relevant transactions. The differences between the laws that pre- and post-date the applicable laws may be academically interesting, but do not affect the result in this case.

### 4.      Informal IRS Documents

Next, Brunswick directs the court's attention to technical advice memoranda ("TAM"), a field service advice, and a non-docketed advice review. According to Brunswick, these materials: (1) provide evidence of administrative practice; and (2) show that all deductions must

be considered at the consolidated level. If depreciation is considered at the consolidated level, as opposed to the subsidiary level, Brunswick would not have to prorate the claimed depreciation. There are several problems with Brunswick's reliance on these materials.

First, Brunswick is not in fact seeking to use the documents at issue as evidence of the IRS's administrative practice, as it is not seeking to use them to support a claim that the IRS issued rulings regarding a particular subject. *See Vons Companies, Inc. v. U.S.*, 51 Fed. Cl. 1, 12-13 (Ct. of Fed. Cl. 2001) (documents are used as evidence of administrative when a party seeks to admit them to show that the IRS issued rulings regarding a particular subject).

Instead, Brunswick is presenting these materials to the court to persuade it to accept Brunswick's desired result. These types of materials, however, are not an "authoritative interpretation of the Code." *U.S. v. Wisconsin Power and Light Co.*, 38 F.3d 329, 335 (7th Cir. 1994) ("technical advice memoranda may not be used or cited as precedent, and this circuit typically does not consider arguments based on these memoranda"); *see also* 26 U.S.C. § 6110(k)(3) ("Precedential status – Unless the Secretary otherwise establishes by regulations, a written determination may not be used or cited as precedent . . . .); *Fox Valley & Vicinity Const. Workers Pension Fund v. Brown*, 897 F.2d 275, 280 n.2 (7th Cir. 1990) (en banc) (a private letter ruling "may not be used or cited as precedent"); *Vons Companies, Inc. v. U.S.*, 51 Fed. Cl. 1, 12-13 (Ct. of Fed. Cl. 2001) (TAMs may only be relied upon as an indication of an IRS administrative practice).

To the extent that Brunswick contends that evidence of an administrative practice furthers its position, the Court of Federal Claim's discussion in *Vons Companies, Inc. v. U.S.* is instructive. As noted by that court:

Private letter rulings and technical advice memoranda, in accordance with section 6110(k)(3) of the Code, may not be used or cited in any precedential way and thus, a fortiori, may not be used to support, in any fashion, an argument that one interpretation of the Code is more authoritative than another. Rather, such rulings and memoranda may be relied upon not for their substance, but only as indication: (i) of the IRS' administrative practice ( *i.e.*, that it has issued rulings regarding a particular subject); or (ii) that, under the *IBM* decision, the Commissioner has abused his discretion under section 7805(b) of the Code in issuing different rulings to two directly competing taxpayers. More extensive use or citation of such rulings not only flatly ignores the plain language of section 6110(k)(3), but also threatens the careful compromise struck by the Congress in enacting that section – one that recognizes the functional relationship between allowing the IRS to use a streamlined review process to issue such rulings and memoranda on a relatively expedited basis in exchange for assurances that those documents will have no precedential impact except as to the taxpayers to which they are issued.

*Vons Companies, Inc. v. U.S.*, 51 Fed.Cl. at 12. Based on *Vons* and Seventh Circuit precedent cited above, the court declines to accept Brunswick's invitation to follow the TAM, the field service advice, and the non-docketed advice review proffered by Brunswick.

In any event, the TAM is inapposite because deductions at issue there were specifically required to be determined at the consolidated return level. *See* IRC § 613A (which was effective until 1980); Treas. Reg. §1.1502-12(p); Treas. Reg. §1.1502-44. On the other hand, the relevant statutes, regulations and case law require depreciation deductions to be computed at the subsidiary level. The court will not comment on the other non-binding administrative materials except to note that even if they were authoritative, they would not persuade the court to ignore specific binding statutory and regulatory authority.

## III.    Conclusion

For the reasons set forth above, the court agrees with the United States' position vis-a-vis the portion of the 1986 tax year beginning after the Bayliner and Sea Ray Acquisitions. Accordingly, the government's motion for summary judgment [#43] is granted, Brunswick's

motion for summary judgment [#39] is denied, and Brunswick's complaint is dismissed with prejudice. The clerk is directed to enter a Rule 58 judgment and to terminate this case from the court's docket. The court also thanks all counsel for their exceptionally thorough and well-written briefs.

DATE:   December 22, 2008

Blanche M. Manning
United States District Judge